IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HARMONY HAUS WESTLAKE, L.L.C., et al., | § § § | |
| Plaintiffs and Counter-Defendants, | § § | |
| v. | § § | CIVIL NO. 1-20-CV-486-XR |
| PARKSTONE PROPERTY OWNERS ASSOCIATION, INC., | § § § | |
| Defendant and Counter-Plaintiff. | § § | |

## PARKSTONE'S MOTION AND BRIEF FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

NIEMANN & HEYER, LLP
Westgate Building, Suite 313
1122 Colorado Street
Austin, Texas 78701
Telephone: (512) 474-6901
Fax: (512) 474-0717

/s/ Eric J. Hansum
Eric J. Hansum
Texas State Bar No.:  24027225
erichansum@niemannlaw.com

**ATTORNEYS FOR THE
PARKSTONE PROPERTY
OWNERS ASSOCIATION, INC.**

## TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................4

II.  OVERVIEW ..................................................................................5

    A.  Parkstone's history before Harmony Haus ................................5

    B.  Harmony Haus's arrival increases parking violations ...............7

    C.  Harmony Haus's parking violations continued to increase after trial ................................................................................8

    D.  Harmony Haus still does not take the parking rules seriously.................................................................................9

    E.  Parkstone acts to address the unabated parking violations ......11

    F.  Harmony Haus reacts to the fine structure.............................. 12

    G.  Parkstone's parking enforcement has been even-handed ........ 12

III.  Summary judgment standards ...................................................... 13

IV.  Argument and grounds:  Harmony Haus's retaliation claim should be dismissed because this claim cannot stand on its own, Harmony Haus cannot prove its prima facie case, and Parkstone had a legitimate non-retaliatory reason that is not pretextual .......... 14

    A.  Fair Housing Act retaliation law.............................................. 14

    B.  Harmony Haus cannot recover on a retaliation claim under section 3617 without showing a violation of some other section of the Fair Housing Act in this lawsuit................ 15

    C.  Harmony Haus cannot establish retaliation ............................ 16

        1.  Much of the conduct Harmony Haus complains of is not sufficiently adverse to constitute retaliation ..... 16

        2.  The causal connection between the protected activity and the adverse action is too remote ............................... 18

**3.    Parkstone had a legitimate non-retaliatory reason
that was not pretextual**...................................................**20**

**V.    Supplemental jurisdiction issues**...............................................**22**

**VI.    Conclusion and requested relief** ........................................................**23**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HARMONY HAUS WESTLAKE, L.L.C., et al., | § § § | |
| Plaintiffs and Counter-Defendants, | § § § | |
| v. | § § | CIVIL NO. 1-20-CV-486-XR |
| PARKSTONE PROPERTY OWNERS ASSOCIATION, INC., | § § § | |
| Defendant and Counter-Plaintiff. | § § | |

**PARKSTONE'S MOTION AND BRIEF FOR PARTIAL SUMMARY JUDGMENT**

The Parkstone Property Owners Association, Inc. ("**Parkstone**") files this Motion and Brief for Partial Summary Judgment against all of the Plaintiffs (individually and/or collectively "**Harmony Haus**") and would show as follows:

## I.
## Introduction

From its inception to the present Harmony Haus has ignored Parkstone's parking restrictions. It did so even after this Court held that Harmony Haus was not entitled to an accommodation excusing it from complying with those restrictions. When Parkstone responded to this calculated assault on the quality of life and safety in the neighborhood, Harmony Haus filed this lawsuit.  After this Court granted Parkstone's Motion to Dismiss on most of Harmony Haus's claims all that remains is a claim for retaliation. The summary judgment evidence proves there was no retaliation and that claim too should be dismissed, leaving only Parkstone's counterclaims for trial.

4

## II.
## Overview

Harmony Haus residents have committed over one thousand parking violations since the trial in this matter. The violations began and continue because Harmony Haus has shown a complete disregard for the rules that ensure continuity in the neighborhood. Harmony Haus has not issued warnings to its residents for parking violations nor have any memberships ended for such violations.

With Harmony Haus unwilling to fulfill its responsibilities as a good neighbor, Parkstone adopted an escalating fine structure intended to ensure that Harmony Haus, as well as other homeowners, follow the rules vital to maintaining the character of the neighborhood. Instead of doing so, Harmony Haus has paid only lip service to the rules, pampering its residents instead of helping them learn to be responsible for their actions; which is the very lesson sober living is intended to teach. If Harmony Haus spent half as much time trying to follow Parkstone's rules as it has opposing them there would be no escalating fines. This analysis begins with an understanding of Parkstone's deed restriction history before Harmony Haus's arrival.

### A.      Parkstone's history before Harmony Haus.

It is undisputed that before Harmony Haus opened there were only infrequent violations of the deed restrictions, and when they did occur, resident compliance was achieved with minimal efforts. (Ex. 1-A, spreadsheet of past homeowner violations before Harmony Haus; Ex. 3, Copeland at p. 11, l. 1 – 7, small number of violations before

Harmony Haus's arrival).[1] In the majority of cases it was easy to persuade residents to comply. (Ex. 3, Copeland at p. 14, l. 2 – 14, limited amount of fining because compliance was achieved early). Before Harmony Haus's arrival, no homeowner had ever committed more than a few violations. (Ex. 1-A, spreadsheet). Over approximately seven years before Harmony Haus's arrival, there were fewer than 100 violations *of any deed restriction*, parking or otherwise, for the *entire Parkstone approximately sixty plus home community*. (Ex. 1-A, spreadsheet). During this time, the most notices any homeowner received before compliance was achieved was five, for a trash can violation (Ex. 1-A, spreadsheet, 5th notice on November 15, 2019).

With respect to parking, a courtesy letter would usually suffice to remedy the situation. (Ex. 3, Copeland at p. 13, l. 21 – p. 14, l. 1). If the problem continued a threat or actual fine of $50 sufficed. (Ex. 1-A, spreadsheet, 2014 entry, $50 fine for an architectural issue; *Findings of Fact and Conclusions of Law*, 1:19-cv-01034-XR, ECF No. 29 at p. 3, § II.4 "Def. Ex. 17 (showing potential fine of $50 for parking violation).").

There was no need for more than a simple system of fines before Harmony Haus because violations *never continued and escalated* as they have with Harmony Haus.  (Ex. 3, Copeland at p. 13, l. 15 -20; Ex. 4, Pye at p. 31, l. 15 – 25). This was true even with prior tenants of Zhou and Du, the owners of the home now rented by Harmony Haus. (Ex. 1-C,

---

[1] References to deposition testimony will be made by listing the person and page and line references will be handled with the letter "p" referring to page(s) and the letter "l" referring to the line(s).  Additionally, the evidence attached in each Exhibit is a true and correct copy of the actual document and each is hereby fully incorporated by reference herein for all purposes.  A declaration is provided on the authentication of certain exhibits in Exhibit 13.

parking violation letter to Zhou for the tenants *before* Harmony Haus arrived, dated October 1, 2014; Ex. 5, Zhou at pp. 24 - 25). The incident occurred when Zhou rented to some students who violated the parking rules. A violation notice was sent and Zhou did not renew the short-term lease, thereby eliminating the problem.  (Ex. 5, Zhou at pp. 24 - 25).

Parkstone has always enforced its parking restrictions, but it never had to deal with violations on the scale of those committed by residents of Harmony Haus.

**B.    Harmony Haus's arrival increases parking violations.**

Harmony Haus arrived in Parkstone in the Fall of 2019. It requested an accommodation and filed its first lawsuit in October of 2019.[2] At trial in January of 2020 Parkstone demonstrated that after Harmony Haus's arrival not only did violations by Harmony Haus residents increase, but so did violations by others encouraged by Harmony Haus's actions. (*See* Ex. 5, Pye trial testimony at pp. 69-70; Pye deposition testimony at p. 32, l. 1-8; Ex. 2 Pye Declaration). The board was not the only one to notice the new parking violations. Parkstone's management company discovered more cars were parking on the street in various places after Harmony Haus's arrival both from personal observations of the property manager and discussions with the management company's driver who would occasionally drive around the neighborhood to check for violations. (Ex. 6, English at p. 20, l. 10 – 17; pp. 47 – 48).

---

[2] The accommodation request was dated October 20, 2019 and sent to the Parkstone Board. Parkstone asks this Court to take judicial notice of the letter date. (*See Plaintiffs' Exhibit 10* from the last trial, 1:19-cv-01034-XR, ECF No. 21-9).

Recognizing that the accommodation requested by Harmony Haus was reasonable only if its residents obeyed the same rules as every other neighbor this Court declined to excuse non-compliance, writing:

> The remaining provisions, including the noise and nuisance provision (Section 2.8) and parking provision (Section 2.11) remain in effect, and Defendant may enforce those if there are violations, though any such enforcement must be applied in an evenhanded manner that treats handicapped and non-handicapped residents alike.

(Findings of Fact and Conclusions of Law, 1:19-cv-01034-XR, ECF No. 29 at p. 12).

During and after the trial the Parkstone Board attempted to determine how to best address the spate of more frequent and ongoing parking violations from both Harmony Haus and other homeowners. (Ex. 3, Copeland, at p. 13, l. 15 – 20 and p. 16). These discussions included how to prove the 12-hour rule was being followed using photographic and video evidence and how to ensure clarity and consistency in enforcement given the unprecedented failure of the existing system of warnings and fines. (Ex. 3, Copeland at pp. 14-16, p. 21; Ex. 1, spreadsheet showing relatively infrequent homeowner violations across the entire neighborhood over seven years).

## C.     Harmony Haus's parking violations continued to increase after trial.

Within two weeks after trial, Harmony Haus expanded the house to 12 residents. (Ex. 7, Ragette at pp. 34-35, about 12 residents all the time and starting right after the judgment). Most residents owned a vehicle and parking violations continued to increase in frequency. (Ex. 4, Pye at p. 34, l. 20 – p. 35, l. 1-4 on the escalation and Ex. 8, KS at p. 20, l. 2-5, each member having a vehicle). A former house manager for the residence admitted he observed parking violations from Harmony Haus residents at least once a

8

week. (Ex. 8, KS at p. 22, l. 13 -18). He also admitted members would forget to move their cars, that he may not be aware of all the violations because he was trying to work his job at the same time, and that there could be lots of violations he did not know about. (Ex. 8, KS at p. 31, l. 20 – 25; p. 32; *see also* Ex. 9, JC at p. 34, l. 8 – 10, parking violations are occurring by Harmony Haus residents). One resident was even assigned a parking spot *on the street* by a house manager and testified others had assigned parking spots as well. (Ex. 10, ET at pp. 15 – 16). Parkstone's records show that the situation was worse than the former manager admitted, with violations increasing since Harmony Haus's arrival and violations occurring almost daily after the first trial *with over 1,000 parking violations since the trial*. (*Cf.* Ex. 1-A, spreadsheet showing deed restriction violations before Harmony Haus's arrival and the first few months in Parkstone *with* Ex. 2-A, over 1,000 violations after the first trial.).

**D.     Harmony Haus still does not take the parking rules seriously.**

Harmony Haus appears to have suggested that its residents follow the parking rules after the prior judgment in this court, but it has done nothing to enforce that suggestion. For instance, while Harmony Haus included some general parking reminder verbiage in admissions packets early on, the parking issue did not appear to have been taken seriously, with a newer, revised parking policy having more detail being created months *after* the Final Judgment. (Ex. 7, Ragette at pp. 64-65). Regardless of this revision, policies are only as good as their enforcement, and in this case, Harmony Haus never intended to enforce its own parking rules. For instance, one version of Harmony Haus's written parking protocol provides:

9

> If it is brought to the attention of Haus Management that a member is not complying with these rules, a warning will be issued. A member who habitually violates these rules is grounds for termination of your membership at the Harmony Haus Westlake Villagio Haus.

(Ex. 12, 12-hr street parking protocol). Proof that Harmony Haus never intended to enforce this rule can be found in the fact that although Harmony Haus has written counseling templates for other company policy violations, it has none for parking violations. (Ex. 7, Ragette at pp. 65-66, 71-72; Ex. 12, written warning template). Nor has Harmony Haus terminated a membership because of parking violations. (Ex. 7, Ragette at p. 67, l. 11–20). This is because Harmony Haus's owner, Dan Ragette, has decided not to enforce Harmony Haus's own parking policies:

> I had made a decision that I am not going to bully my guys over this parking thing.  No, I am not going to hurt these guys' feelings by hurting them that way.  No, I am not going to do that to my members. . . .

(Ex. 7, Ragette at p. 67, l. 11-20; *see also* p. 66; Ex. 8, KS at pp. 9, 24, no write ups or membership terminations for parking violations by this house manager while in charge from January or February of 2020 to June or July of 2020; Ex. 9, JC at p. 21, house manager after witness KS who never gave any writes ups or membership terminations for parking violations). It should therefore come as no surprise that as Harmony Haus increased the number of people in the residence after the first trial, that so too would the number of parking violations in the community.

In contrast to how parking violations are handled, a Harmony Haus manager admitted that members are written up for violations of other Harmony Haus rules.  (Ex. 8, KS at p. 29, l. 18 – p. 30, l. 23). In essence, Harmony Haus is counting on this lawsuit to avoid following this Court's specific finding that the parking rule should be obeyed. In

the meantime, the homeowner, Zhou, has done nothing to address the parking violations. Despite Zhou's receipt of numerous violation letters, he claims he still does not know if violations are occurring and so far has only bothered to look at one or two photos of the parking violations.  (Ex. 5, Zhou at p. 15, l. 9 – 24).

**E.      Parkstone acts to address the unabated parking violations.**

On March 3, 2020, with parking violations continuing to accelerate by multiple homeowners, the Parkstone Board unanimously approved changes to the rules and by-laws that clarified how violations would be determined to exist and created an escalating fine structure to discourage repeat offenders. (Ex. 1, board meeting minutes). The rules adopted did not change the existing parking restrictions; instead it provided *consistency* in protocol by outlining the way all violations of the Declarations would be addressed by the board. (Ex. 14, rule clarifications, which Parkstone asks this Court to take judicial notice of as these are the certified, official records). The amended rules created a consistent fining schedule for curable and incurable violations. With respect to curable violations like those of the street parking rule, there is an optional courtesy warning, then the fines escalating in "daily/weekly or one-time" increments by $25, $50, $100, $125, and then increasing in $25 increments for each additional notice. (Ex. 14, rule clarifications).

Originally there was no cap on the dollar amounts of the fines because the board did not contemplate the possibility that a homeowner would simply refuse to comply, but the conduct of Harmony Haus residents proved that was wishful thinking. Due to the continued violations, the board passed a cap of $300 per violation on September 28, 2020. (Ex. 1, meeting minutes).

11

The board did not adopt the new fines in reaction to Harmony Haus's accommodation claim or the first lawsuit, but rather in response to the increasing number of Harmony Haus violations after the judgment in the first lawsuit and an increase in violations by other residents of Parkstone. (Ex. 3, Copeland at p. 13, l. 15 -20; Ex. 4, Pye at p. 31, l. 15 – 25).

**F.    Harmony Haus reacts to the fine structure.**

The escalating fine structure has encouraged Harmony Haus to at least pretend it cares about the parking regulations. It has not however induced compliance because Harmony Haus is using this lawsuit as cover for its unwillingness to be a good neighbor and follow the same rules as every other house in Parkstone.

In May of 2020, months after filing this lawsuit, Harmony Haus did inquire with the LCRA about alternative parking options. (Ex. 7, Ragette at p. 60). But it did so only because Harmony Haus was receiving "all these freaking notices" on fines and not from any obligation or good will to follow the court's Final Judgment. (Ex. 7, Ragette at p. 61, l. 1-7). In other words, the system of fines has worked, at least to the extent of making Harmony Haus take a few tentative steps toward compliance. It is clear that without the fines Harmony Haus would not change their behavior in any way.

**G.    Parkstone's parking enforcement has been even-handed.**

Notices for parking violations were being sent and tracked before Harmony Haus arrived and continued to be sent to all violators after Harmony Haus arrived. (Ex. 1-A, parking spreadsheet showing violations before Harmony Haus's arrival; Ex. 2, Pye Declaration; Ex. 1-C, letter to Zhou on prior tenants). Harmony Haus receives more notices than anyone else, but only because it violates the rules more than anyone else.

(Ex. 2-A, over 1,000 violations). The board's treatment of Harmony Haus has been consistent and even-handed as other homeowners have also received such violations letters. (Ex. 2, Pye Declaration).

Parkstone has also gathered more photographic evidence of Harmony Haus violations than it has of violations by other residents, but the same kind of photos have been taken to document other violations. (Ex. 2, Pye Declaration and Exhibit C to that Declaration; Ex. 4, Pye Depo. at pp. 44 - 46).  The number of photos of Harmony Haus violations reflects the higher number of violations by its residents and the board's concern that Harmony Haus refuses to admit to or address the volume of violations. (Ex. 2-A, spreadsheet showing the numbers of violations by Harmony Haus residents; Ex. 5, Zhou at p. 15, l. 9 – 24, Zhou is not admitting the violations are occurring).

In summary, Parkstone had to take action because Harmony Haus refused to follow the rules or encourage its residents to follow the rules.  (Ex. 4, Pye Depo. at p. 35, l. 22 – p. 36, l. 5). This was not retaliation, but an effort to force Harmony Haus to comply with what this Court instructed them to do, and what all neighbors by law agree to do as members of the community. (Ex. 2, Pye Declaration, no retaliatory intent by the board).

### III.
### Summary judgment standards

Since this Court is intimately familiar with the general summary judgment standards, they will not be repeated here. *See Amadasun v. Datasearch*, Inc., No. SA-19-CV-01130-XR, 2020 WL 5913834, at *2 (W.D. Tex. Oct. 6, 2020) (setting forth the summary judgment standards).

13

**IV.**
**Argument and grounds:**
**Harmony Haus's retaliation claim should be dismissed because**
**this claim cannot stand on its own, Harmony Haus cannot prove**
**its prima facie case, and Parkstone had a legitimate non-**
**retaliatory reason that is not pretextual.**

**A.     Fair Housing Act retaliation law.**

The Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of enjoyment" of "any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.  The general elements of a retaliation claim can be analyzed by using Title VII retaliation and similar employment law standards. *Chavez v. Aber*, 122 F. Supp. 3d 581, 599 (W.D. Tex. 2015), citing *Texas v. Crest Asset Mgmt. Inc.*, 85 F. Supp. 2d 722, 733 (S.D. Tex. 2000). To prove retaliation, a plaintiff must demonstrate that "(1) he engaged in an activity that [the FHA] protects; (2) he was subjected to an adverse [action by the defendant]; and (3) a causal connection exists between the protected activity and the adverse ... action." *Cox v. Phase III, Invs.*, 2013 WL 3110218, at *10 (S.D. Tex. June 14, 2013).

Retaliation claims have long been evaluated under the *McDonnell Douglas-Burdine[3]* allocation of the order and burden of proof.  *See*, *e.g.*, *Byers*, 209 F.3d at 427; *Chaffin v. John H. Carter Co., Inc.*, 179 F.3d 316, 319 (5th Cir. 1999) (*McDonnell-Douglas* applies to FMLA retaliation claims, just as to Title VII retaliation claims). Harmony Haus must establish a prima facie case as part of its burden of proof, and if it does, the burden then shifts to Parkstone to state a legitimate, non-retaliatory reason for its action; after

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

stating that reason, the burden shifts back to Harmony Haus to demonstrate that Parkstone's reason is a pretext for retaliation. *See LeMaire v. Louisiana Dept. of Transp.*, 480 F.3d 383, 388-89 (5th Cir. 2007) (providing the burden shifting framework in retaliation cases).

Under this rubric, there is no mixed motive theory used in evaluating Parkstone's reason; Harmony Haus must show but-for causation by a preponderance of the evidence while it maintains the burden of persuasion at all times. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 362 (2013) (but-for causation on Title VII claims); *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009) (but-for causation on ADEA claims). This means Harmony Haus must prove that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of" Parkstone.  *See e.g., Nassar,* 570 U.S. at 360.  During a pretext analysis, the Court is not supposed to "engage in second-guessing" of the company's business decision even if not perfect.  *See LeMaire*, 480 F.3d at 391 (discussing business judgment rule in the employment law context).

**B.    Harmony Haus cannot recover on a retaliation claim under section 3617 without showing a violation of some other section of the Fair Housing Act in this lawsuit.**

A retaliation claim cannot stand alone once the underlying claims of other sections of the Fair Housing Act are dismissed in the same lawsuit as explained by a district court when analyzing Fifth Circuit decisions on this issue:

> The Fifth Circuit, however, has indicated § 3617 claims *do* require an underlying violation of §§ 3603, 3604, 3605, or 3606. For example, in *Hood v. Pope*, the Fifth Circuit held a plaintiff had failed to state a claim under § 3604, and therefore, "[a]ny subsequent harassment by any of the defendants did not violate § 3617." Similarly, in *McZeal v. Ocwen Financial Corp.*, the Fifth Circuit held "[b]ecause [plaintiff's] § 3605 claim fails, [his] claim under § 3617 must also fail."

*Cf. Treece v. Perrier Condo. Owners Ass'n, Inc.*, No. 17-10153, 2019 WL 6464984, at *8 (E.D. La. Dec. 2, 2019), *with Oxford House v. City of Baton Rouge*, 932 F. Supp. 2d 683, 701 (M.D. La. 2013) (allowing a section 3617 claim to stand on its own); *see also McZeal v. Ocwen Fin. Corp*, 252 F.3d 1355, at *2 (5th Cir. 2001) (3617 claim did not exist where there was not a 3605 claim); *Hood v. Pope*, 627 F. App'x 295, 300 (5th Cir. 2015) (3617 claim did not exist when there is not a 3604 claim).

Harmony Haus's only remaining affirmative claim in this lawsuit is a section 3617 retaliation claim. As a matter of law, this is not a viable cause of action standing by itself.

## C.  Harmony Haus cannot establish retaliation.

No reasonable person could conclude, given the undisputed facts, that Parkstone's adoption of a new structure of fines for violation of its parking rules was in retaliation for Harmony Haus having filed its earlier FHA lawsuit. Many of Harmony Haus's alleged acts of retaliation, such as the use of cameras or isolated exchanges of profanity are not harmful enough to be considered adverse actions. More important, there is no evidence of a causal connection between any protected activity and the adoption of the new fine structure. There is a clear connection between the ever-increasing number of parking violations and the adoption of the fine structure while there is no persuasive connection between its adoption and the filing of Harmony Haus's first lawsuit and accommodation request. As a matter of law, Harmony Haus's retaliation claim should be dismissed.

### 1.  Much of the conduct Harmony Haus complains of is not sufficiently adverse to constitute retaliation.

To support a claim for retaliation under the FHA, an adverse action must "'coerce, intimidate, threaten, or interfere with' the party" and "must have some materially adverse

16

effect on the plaintiff...." *Joseph's H. and Shelter, Inc. v. City of Troy, N.Y.*, 641 F. Supp. 2d 154, 159 (N.D.N.Y. 2009). Courts evaluating this element in the employment context have stated, "[t]he key question is whether the challenged action is 'materially adverse' in that it is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015) (quoting *Burlington Northern. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

Harmony Haus complains about Parkstone's use of cameras to document Harmony Haus's numerous 12-hour parking violations. Collecting evidence of what is undeniably a violation of the parking rules is not materially adverse to Harmony Haus. It does not change Harmony Haus's liability, it merely proves it. Nor did the cameras dissuade anyone from trying to exercise their rights for both Harmony Haus and a resident say they filed complaints with HUD about the use of cameras. (*See e.g.*, Ex. 7, Ragette at p. 98, l. 10-21; Ex. 9, JC at p. 53, l. 10 -16).[4] Moreover, the multiple cameras used by Parkstone cover a broad stretch of the neighborhood that includes ten houses. Those covered other than Harmony Haus are the houses that had the most chronic parking problems after Harmony Haus's arrival. (Ex. 4, Pye at pp. 44 – 46, p. 49). As noted by Goodwin & Company, who manage numerous homeowner associations, it is extremely common to use photographic and video evidence to establish violations. (Ex. 11, Krauss at p. 35, l. 6 – 15). It is necessary because an occasional drive-by by a Goodwin

---

[4] It is worth noting that Harmony Haus owner Dan Ragette responded to the violation notices he received by taking his own pictures of purported violations. (Ex. 7, Ragette at pp. 41-44).

17

driver would not be sufficient to determine if a 12-hour violation had occurred. (Ex. 6, English at p. 16, l. 12 – 17; p. 17, l. 14 - 21). The photo taking was neither adverse to nor was it only applied to Harmony Haus.[5]

Other actions about which Harmony Haus complains also fail to qualify as being adverse. Harmony Haus complains that a board member used profanity in addressing Dan Ragette although Ragette used equally profane language to board members.[6] It also complains that a few notes were put on some residents' cars mentioning parking violations. In one instance, the resident who found the note responded with a commonly used offensive gesture intended to convey an insult. (Ex. 10, ET at p. 25, l. 3 – 22). None of this kind of behavior, however, can support a claim of retaliation.

### 2. The causal connection between the protected activity and the adverse action is too remote.

Even if the temporal connection between the adoption of the fine structure and Harmony Haus's accommodation request/first lawsuit was previously sufficient to defeat a Motion to Dismiss, mere "plausibility" of an allegation will not work to defeat a summary judgment motion supported by undisputed facts. *See, e.g., Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (a rigorous factual and evidentiary analysis especially of the McDonnell-Douglas burden-shifting should not occur at the Motion to Dismiss stage and is better suited for the summary judgment stage); *Thompson*

---

[5] Harmony Haus also argues that the use of photographic and video evidence is unfair while refusing to accept anything less as evidence of its violations. (*See* Ex. 4, Pye at p. 25, l. 10 -16, some board members discussed the need for photographic evidence to help prove any violations; Ex. 5, Zhou at p. 15, l. 9 – 24, he is not sure the violations are occurring).
[6] Mr. Pye testified that Ragette taunted, threatened and yelled at him. (Ex. 4, Pye at pp. 58 – 59). Ragette testified that he told Mr. Pye to "fuck off" called him a "goofy ass fucker" and said he was coming after Mr. Pye personally. (Ex. 7, Ragette at pp. 48 – 49).

*v. City of Waco*, 764 F.3d 500, 506 (5th Cir. 2014) (explaining a more fact intensive inquiry is "better suited for the summary-judgment or trial stage" than the Motion to Dismiss stage because of the more lenient "plausibility" standard at the Rule 12(b) stage).

Although the adoption of increasing fines followed the judgment in the first lawsuit by only a few weeks, it came months after Harmony Haus first requested an accommodation and filed suit as shown by this timeline:

  - ➢ 10/20/19    Accommodation request by Harmony Haus;
  - ➢ 10/22/19    First lawsuit filing related to the accommodation request;
  - ➢ 2/18/20     Final Judgment from first lawsuit;
  - ➢ 3/5/20      Parkstone rule clarifications filed with the county;
  - ➢ 3/31/20     Next accommodation request by Harmony Haus; and
  - ➢ 5/5/20      Second lawsuit filing.

The gap from *Harmony Haus's* first alleged protected activity, the accommodation request in October of 2019, to the filing of the clarifications or amendments in March of 2020, is approximately four-and-a-half months. This is outside the generally accepted causation period in the Fifth Circuit of four months. *See Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that "a time lapse of *up to four months* has been found sufficient.") (emphasis added); *Raggs v. Mississippi Power Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (action taken in a five-month period not enough to satisfy the causation requirement). To infer a causal connection to the protected activities requires "'very close'" proximity. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted). Three-and-four month periods between the *protected activity* and any adverse action have at times been found to be too remote in time to show causation

especially when standing alone, and each instance of protected activity should not be used "to re-start the temporal-proximity clock." *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 429 n.23 (5th Cir. 2017); *see also Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 243 (5th Cir. 2019) (summarizing causation precedent where up to four months was the outer limit on causation).

More important, Parkstone's action came after months of parking violations by Harmony Haus and other homeowners that only increased after the judgment in the previous case was entered. (*See e.g.*, Ex. 1-A & 2-A, spreadsheet comparisons before and after Harmony Haus's arrival). It also came when traditional methods of enforcement were unsuccessful. (Ex. 3, Copeland at p. 13, l. 15 -20; Ex. 4, Pye at p. 31, l. 15 – 25). It is no wonder the Board denies any retaliatory intent; there was none. (Ex. 2, Pye Declaration).

Even if the Final Judgment in February *restarted* the temporary proximity clock, which is refuted, Harmony Haus cannot rely on just temporal proximity to prove its case. It must show additional evidence of retaliatory intent, which it has failed to do given the parking violations escalated drastically from Parkstone's prior history.

### 3. Parkstone had a legitimate non-retaliatory reason that was not pretextual.

The summary judgment evidence establishes a legitimate non-retaliatory reason for Parkstone's action – to persuade Harmony Haus and other residents to follow the

rules when the existing method had failed.[7] (Ex. 3, Copeland at p. 13, l. 15 -20; Ex. 4, Pye at p. 31, l. 15 – 25). There is no evidence of pretext.

First, there is no evidence of differential treatment on parking violations; that is, there is no evidence that non-residents of Harmony Haus were not given violation notices on the same basis as Harmony Haus. Harmony Haus received more notices in direct relation to the number of their violations.

Second, the board's vote for the enforcement plan (Ex. 1, meeting minutes) was unanimous.[8] Harmony Haus will undoubtedly claim one or two board members acted in ways that evidence an animus toward it.  However, the Fifth Circuit requires that *all* board members, *i.e.* all of the decision-makers, must have a discriminatory or retaliatory animus. *See Harville v. City of Hous.*, 945 F.3d 870, 878 (5th Cir. 2019) (demonstrating that one person had an improper motive is not enough, the party must show that an improper motive "infected the *entire board* or that other members were similarly motivated") (emphasis added).

Third, there is no evidence of but-for causation. Even if there had been no accommodation request and no lawsuit, putting twelve residents in a house with six driveway parking places would have inevitably lead to parking violations when combined with the attitude of Harmony Haus's owner that it was essentially above the law, or at least above the rules followed by other Parkstone residents. Harmony Haus never had a plan for or the intent to follow the rules, and some kind of enhanced enforcement would

---

[7] A significant contributor to the violation problem was undoubtedly Harmony Haus's decision not to take effective action to enforce the parking rule amongst its members.
[8] All four members present voted in favor. The fifth member of the board was not at the meeting.

have inevitably been necessary. The cause of the change in fines was not Harmony Haus's protected activity, but its disregard of the rules along with other homeowners. As noted by the Fifth Circuit, the but-for standard is a "high burden." *See Alkhawaldeh*, 851 F.3d at 430. Harmony Haus has not met and cannot meet this burden.

As a matter of law, Harmony Haus cannot establish a *prima facie* case of retaliation and even if it could, Parkstone's legitimate non-retaliatory reason was not pretextual. Accordingly, Harmony Haus's retaliation claim should be dismissed.

## V.
## Supplemental jurisdiction issues

After dismissal of the retaliation claim, the only remaining claims will be Parkstone's state law counterclaims. While the general rule is usually to dismiss such state law claims (*without prejudice*) as part of declining to exercise supplemental jurisdiction, the rule is not absolute. *See* 28 U.S.C. § 1367 (plain reading makes exercising supplemental jurisdiction a discretionary act). In making this decision, the district court can review the specific circumstances in the case at bar including both the statute "and the balance of the relevant factors of judicial economy, convenience, fairness, and comity." *Batiste v. Island Records Inc.*, 179 F.3d 217, 227 (5th Cir. 1999).

Those factors support this court exercising such jurisdiction over the state law claims. Parkstone's claims are for breach of contract and the *Texas Property Code*. There is nothing complex or novel about the counterclaims for standard or ordinary deed restriction violations and damages that flow from them; there should be no inherent need to defer to a state court comity wise on such issues.

With respect to the other factors, this court is intimately familiar with the parties and the general background facts given it oversaw the first bench trial between the parties and issues in the second bench trial occasionally reference what happened in the first trial. Judicial economy, fairness, and convenience strongly favor this Court deciding the state law claims in this matter. Also, potentially restarting discovery in state court with repetitive motion and discovery possibilities is not productive. Consequently, Parkstone respectfully requests this Court exercise supplemental jurisdiction over Parkstone's state law counterclaims based on these grounds.

## VI.
## Conclusion and requested relief

For all the reasons cited, Parkstone is, as a matter of law, entitled to a partial summary judgment on Harmony Haus's retaliation claim and dismiss such claim, that this Court exercise supplemental jurisdiction over Parkstone's remaining state law counterclaims, and order such other and further relief to which Parkstone may be justly entitled, either at law or in equity.

23

Respectfully submitted,


NIEMANN & HEYER, LLP
Westgate Building, Suite 313
1122 Colorado Street
Austin, Texas 78701
Telephone: (512) 474-6901
Fax: (512) 474-0717

/s/ Eric J. Hansum
Eric J. Hansum, Of Counsel
Texas State Bar No.:  24027225
erichansum@niemannlaw.com

**ATTORNEYS FOR THE
PARKSTONE PROPERTY
OWNERS ASSOCIATION, INC.**


**CERTIFICATE OF SERVICE**

I certify that on January 28, 2021, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Eric J. Hansum*
Eric J. Hansum

24