# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| HARMONY HAUS WESTLAKE, LLC, et al., | § § § | |
| *Plaintiffs*, | § § | Civil Action No.  1:20-CV-486-XR |
| v. | § § | |
| PARKSTONE PROPERTY OWNERS ASSOCIATION, INC. | § § § | |
| *Defendant*. | § § | |

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

On this date, the Court considered Defendant's motion to exclude the testimony of Plaintiff's expert witness, Dr. Robert Beare (ECF No. 40), Defendant's motion for partial summary judgment (ECF No. 23); Plaintiffs' motion for summary judgment (ECF No. 43), and the parties' responses and replies thereto. After careful consideration, the Court issues the following order.

## BACKGROUND[1]

This is a dispute between a sober living home and a homeowners association. Plaintiff Harmony Haus Westlake, LLC ("Harmony Haus") operates a "transitional sober living residence" located at 2105 Real Catorce Drive, Austin, Texas. Plaintiffs Ling Zhou ("Zhou") and Fenglin Du ("Du") own the residence, which is located within the homeowners association operated by Defendant Parkstone Property Owners Association, Inc. ("Defendant").

---

[1]     These facts are undisputed unless otherwise noted.

## I.     The First Lawsuit (1:19-CV-1034-XR)

This is not the parties' first time before this Court. In October 2019, Plaintiffs filed an action against Defendant, complaining that Parkstone had refused to grant a reasonable accommodation from its deed restrictions, in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"). *See Harmony Haus Westlake, LLC v. Parkstone Prop. Owners Ass'n, Inc.*, No. 1:19-CV-1034-XR (the "First Lawsuit"), ECF No. 1. At issue in that case were three deed restrictions (collectively, the "Declaration"): a single-family use restriction, a noise and nuisance restriction, and a twelve-hour street parking restriction. Plaintiffs requested from Defendant an exemption from "any applicable HOA covenant, rule, or regulation relating to any restriction that would otherwise impede [Harmony Haus's] operations so that its residents can be provided an equal opportunity to use and enjoy their housing." Specifically, Plaintiffs sought for Defendant to allow up to twelve residents to live at the home and for eight cars to park on the street. In response, Defendant offered to allow up to six unrelated adults to live at the home.

A bench trial was held on January 6 and 7, 2020, after which the Court issued its Findings of Fact and Conclusions of Law. *See Harmony Haus Westlake, LLC v. Parkstone Prop. Owners Ass'n, Inc.*, 440 F. Supp. 3d 654 (W.D. Tex. 2020). First, the Court found that the residents were "handicapped" as defined under the FHA because their "addictions substantially limit their ability to live independently and to live with their families," and their inability to live independently constitutes a substantial limitation on their ability to 'care for themselves.'" *Id.* at 663. Second, the Court found that the requested accommodation was necessary in that Plaintiffs showed the accommodation would "directly ameliorate" the disability's effect. *Id.* at 665–66. The Court found persuasive Plaintiffs' arguments that the accommodation of twelve residents was necessary for the residents to benefit from the home's phasing system and to benefit from the increased

accountability, structure, and support inherent in a larger number of residents. *Id.* at 666. The Court did not, however, find that Plaintiffs had shown the accommodation was financially necessary. *Id.* Third and finally, the Court found that Plaintiffs met their burden of showing that the requested accommodation was reasonable in that the accommodation did not impose upon Defendant an "undue financial and administrative burden" and did not constitute a "fundamental alteration" to the character of the neighborhood. *Id.* at 667. The Court agreed with other federal courts who "have made clear that single family deed restrictions cannot be used to exclude group homes for disabled persons from single family neighborhoods." *Id.* at 668 (citing *United States v. Wagner*, 940 F. Supp. 972, 979 (N.D. Tex. 1996) (collecting cases)).

As a result of those findings, the Court granted Plaintiffs' request for injunctive relief and ordered that:

> Defendant is enjoined from further refusing to make a reasonable accommodation that is necessary to afford Plaintiffs an equal opportunity to use and enjoy a dwelling. Consequently, Defendant is enjoined from enforcing its Declaration against Plaintiffs, but <u>solely</u> with respect to the single-family housing restriction, Section 2.1.

*Id.* at 669 (emphasis in original). The Court explicitly did not enjoin Defendant from enforcing its other restrictions at issue—the noise/nuisance and parking provisions—finding that Defendant "may enforce those if there are violations, though any such enforcement must be applied in an evenhanded manner that treats handicapped and non-handicapped residents alike." *Id*. The Court noted that:

> [n]othing here suggests that Harmony Haus residents have free reign to violate any provisions of the Declaration. Each resident is expected to know all relevant deed restrictions—including the parking and noise restrictions—and strictly adhere to them. Parkstone, in turn, is entitled to demand such strict adherence and, of course, may enforce the Declaration through its own enforcement mechanisms.

*Id.*

## II.      The Second Lawsuit (1:20-CV-486-XR)

Plaintiffs' First Amended Complaint in this case—Plaintiffs' second action against Parkstone—alleges that the dispute has worsened amidst the coronavirus pandemic and the various shelter-in-place ordinances imposed by state and local governments. The dispute is no longer about the number of residents at Harmony Haus but about the enforcement of Defendant's parking restrictions, particularly during a pandemic which, Plaintiffs allege, has made compliance with those restrictions difficult if not practically impossible.

On March 3, 2020, two weeks after this Court issued its final judgment in the prior case, the Parkstone Board unanimously approved changes to the rules and bylaws that included an escalating fine structure for violation of the Declaration. ECF No. 42-14. With respect to parking violations, the new enforcement scheme provides for an optional courtesy warning, followed by fines escalating in "daily/weekly or one-time" increments by $25, $50, $100, $125, and then increasing in $25 increments for each additional notice. *Id.* at 6. The Board eventually capped the fines at $300 per violation. ECF No. 42-1. Defendant also enacted a new deed restriction preemptively disallowing any reasonable accommodation request with respect to the single-family use restriction for any residence within 1,000 feet of Harmony Haus. ECF No. 42-14 at 9.

Plaintiffs assert that Defendant imposed these new rules and enforcement schemes "for the specific purpose of targeting Plaintiffs and individuals with disabilities in general." ECF No. 8. In support, Plaintiffs allege that prior to the Court's issuance of final judgment in the previous case, Defendant made little effort to enforce the then-existing parking restrictions, "such that its post-judgment enforcement efforts clearly arose as a response to the judgment." *Id.* ¶ 2. Plaintiffs further allege that a "barrage of profanity" and "facially discriminatory remarks by [Parkstone] Board members" further reveal intentional discrimination and retaliation. *Id.* ¶ 12.

4

Soon after Defendant imposed the new fine structure and began sending violation notices, the coronavirus pandemic arose. Plaintiffs assert that, after the City of Austin issued its shelter-in-place order on March 24, 2020, Harmony Haus residents "could not go to work or engage in any other activity outside the residence" (unless expressly permitted by the shelter-in-place order) and that residents "could not take any measures" to move their vehicles off the street to avoid violating Defendant's street-parking restriction. *Id.* ¶ 7.

On March 31, 2021, Plaintiffs sought an accommodation from Defendant, requesting a waiver of the twelve-hour street-parking restriction during the course of the shelter-in-place order. Defendant allegedly "countered with an offer to allow four vehicles to park on the street during the pendency of the order, but only if the driveway and garage were fully utilized at all times." *Id.* ¶ 11. This would require Plaintiffs to have eight cars parked in the driveway and garage at all times, meaning if one resident removed his car from the driveway, another resident would have to move his car from the street to keep the driveway at maximum "occupancy" before any street parking beyond twelve hours would be permissible. Plaintiffs countered that they could not "(1) keep eight vehicles in the driveway and garage . . . or (2) move all the vehicles in and out of the driveway every time a resident has to leave," pointing to the fact that residents may be working from home or in meetings and "cannot rush outside to move cars around at any given moment" and to Defendant's concern in the previous litigation that the noise involved in moving cars in and out of the driveway was bothersome to neighbors. *Id.*

Plaintiffs filed this lawsuit on May 5, 2020, alleging violations of the Fair Housing Act. Specifically, Plaintiffs asserted four claims under the FHA: (1) discrimination in the sale or rental, or otherwise making unavailable, a dwelling because of a disability, in violation of 42 U.S.C. § 3604(f)(1); (2) discrimination in the terms, conditions, or privileges of a dwelling, or in the

provision of services or facilities in connection with that dwelling, in violation of § 3604(f)(2); (3) refusal to make a reasonable accommodation in violation of § 3604(f)(3)(B); and (4) intimidation, threat, or interference with the exercise or enjoyment of a right protected by the FHA, in violation of § 3617.

Plaintiffs filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin Defendant from enforcing its parking restriction against Harmony Haus (or collecting fines imposed on the basis of such violations) "until further order of this Court." ECF No. 2 at 16. After a hearing on May 12, 2020, this Court denied Plaintiffs' motion, finding that Plaintiffs had not shown that they would suffer irreparable injury. *See* Text Order, May 12, 2020.

On May 11, 2020, Parkstone filed a Motion to Dismiss the First Amended Complaint (ECF No. 11). Thereafter, on June 10, Plaintiffs filed a second motion for a temporary restraining order, alleging that they now faced irreparable harm because Plaintiffs Zhou and Du expressed an intention to evict Plaintiff Harmony Haus from the property if the violations continued. ECF No. 13. At a hearing on June 17, 2020, the Court denied that motion, finding that Plaintiffs had not demonstrated a substantial likelihood of success on the merits. *See* Text Order, June 17, 2020.

This Court issued its Order granting in part and denying in part Parkstone's Motion to Dismiss on June 23, 2020. ECF No. 19. Therein, the Court found that Plaintiffs failed to plead a plausible claim of intentional discrimination under § 3604(f)(1), disparate treatment under § 3604(f)(2), or failure to accommodate under § 3604(f)(3)(B), and dismissed those claims. *Id.* at 8–18. Specifically, the Court concluded that Plaintiffs had not plausibly alleged that the new fine structure was imposed "because of a handicap"—rather than as a result of their repeated parking violations—as required to state a claim for discrimination under the FHA. *Id.* at 10, 14. Plaintiffs also failed to establish that the requested accommodation—a blanket exemption from the twelve-

hour parking rule—was necessary, but merely showed that the parking restrictions were "inconvenient." *Id.* at 16. However, the Court found that Plaintiffs had stated a claim for retaliation under § 3617 and denied Defendant's motion to dismiss that claim. *Id.* at 18–22.

On July 6, 2020, Parkstone filed an Answer and Counterclaim against Plaintiffs, and an Amended Answer and Counterclaim on October 7, 2020 (ECF No. 35), asserting claims for breach of contract (along with a claim for attorneys' fees and costs) and civil damages under Texas Property Code § 202.004 in the amount of $200 per day for each day of parking violations.

### III.   The Fifth Circuit's Ruling on the First Lawsuit (issued on May 18, 2021)

Defendant appealed the Court's findings in the First Lawsuit, and Plaintiffs appealed the Court's denial of attorneys' fees. *See* First Lawsuit, ECF Nos. 31, 33 (docketed as Case Number 20-50185 and 20-50208). The cases were argued in December 2020. On May 18, 2021, the Fifth Circuit Court of Appeals issued a mandate affirming in part and reversing in part the Court's Final Judgment in that case. *Harmony Haus Westlake, LLC v. Parkstone Prop. Owners Ass'n.,* 851 F. App'x. 461 (5th Cir. 2021). The Fifth Circuit concluded that Harmony Haus had not demonstrated that its requested accommodation was necessary under the FHA and thus was not entitled to attorneys' fees awarded to a prevailing party. The Fifth Circuit further found that Parkstone's counterclaims were not waived and that Parkstone provided "some evidence" of violations of the parking and noise restrictions that formed the basis of those counterclaims. *Id.* at 467. Finally, it remanded and directed this Court to rule on Parkstone's request for attorneys' fees under the Texas Property Code and to enter an order enjoining Plaintiffs from violating the Declaration. *Id.* at 468.

Parkstone filed a motion to amend the judgment in accordance with the Fifth Circuit's mandate. First Lawsuit, ECF No. 38. After a hearing, the Court granted Parkstone's motion and concluded that Parkstone was entitled to $6,000 in attorneys' fees. *See id.*, ECF No. 46. In

accordance with the Fifth Circuit's mandate, the Court found that Parkstone did not waive its breach of contract claim and that the evidence at trial showed violations of the restrictive covenant's parking and noise provisions, and enjoined Plaintiffs from violating the parking restrictions. *See id.*, ECF No. 46 (noting that Parkstone's motion to amend the judgment, ECF No. 38, had been granted in part in open court at the hearing and further awarding attorneys' fees); ECF No. 47 (memorializing and clarifying the Court's previous orders).

## IV.   The Instant Motions

Both sides now move for summary judgment. Parkstone moves for summary judgment on the basis that (1) there is no stand-alone claim for retaliation under the FHA as a matter of law; and (2) no reasonable person could conclude based on the undisputed facts that Parkstone's actions were taken in retaliation for Harmony Haus's protected conduct (*i.e.*, there is no causation as a matter of law). In support of this second argument, Parkstone also contends that (1) much of the conduct Harmony Haus complains of (such as Parkstone's use of cameras to document violations, a board member's use of profane language, and notes on residents' cars) are not sufficiently adverse to qualify as retaliation; (2) the temporal connection between the protected activity (requested accommodation in October 2019) and the adverse action in March 2020 is too remote and the parking enforcement changes came after parking violations increased and traditional methods of enforcement were unsuccessful; and (3) Parkstone had a legitimate non-retaliatory reason—to persuade Harmony Haus and other residents to follow the rules—that was not pretextual and Parkstone did not engage in differential treatment on parking violations.

Plaintiffs move for partial summary judgment with respect to the damages components of Parkstone's counterclaims. With the escalating fee structure now in place, Parkstone has assessed fines "reach[ing] the six figures," relating to over 1,000 alleged parking violations since the

conclusion of the first trial. ECF No. 43-10 at 6; ECF No. 42 at 9 (citing ECF No. 42-2, Ex. A). Plaintiffs contend that although Parkstone asserts claims for breach of contract and Texas Property Code § 202.004, it has "consistently limited the calculation of its claimed damages to a summation of the fines it has imposed" and "associated statutory damages under the Texas Property Code," and "makes no reference to any specific actual damages suffered and offers no calculation of such damages. ECF No. 43 at 4. Plaintiffs thus argue that Defendant "has no viable mechanism for recovering the damages it has calculated" because it has no evidence of any actual damages. *Id.* Plaintiffs argue that "Texas law does not permit Defendant to use the intervention of this Court as a mechanism to collect punitive fines through the causes of action it has asserted without a showing of actual damages." *Id.* at 5.

Parkstone also seeks to exclude the testimony of Dr. Robert Beare, Plaintiffs' expert in substance abuse treatment, as unreliable under Rule 702 of the Federal Rules of Evidence. Specifically, Parkstone asserts that Dr. Beare's testimony concerning the potentially fatal consequences of terminating Harmony Haus memberships based on parking violations lacks a scientifically valid foundation because Dr. Beare is not familiar with the medical histories of the Harmony Haus residents and is further barred by the doctrine of collateral estoppel. *See* ECF Nos. 45, 51. Because the Court's Rule 702 analysis clarifies the scope of the parties' remaining claims, the Court will first address Defendant's *Daubert* motion before proceeding to the parties' cross-motions for summary judgment.

## ANALYSIS

I.     **Motion to Strike Expert Testimony**

A.     **Legal Standards**

Rule 702 of the Federal Rules of Evidence allows a witness "who is qualified as an expert" to testify if:

a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b)     the testimony is based on sufficient facts or data;

c)     the testimony is the product of reliable principles and methods; and

d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id*. at 589. As a preliminary matter, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). If the expert is qualified, a court must follow *Daubert*'s analytical framework to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id*. at 592–93. The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v. Carmichael*, 526

10

U.S. 137, 150 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

The relevance inquiry requires the Court to determine if expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." FED. R. EVID. 401.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, Adv. Comm. Notes (2000). A trial court's role as gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (citing Rule 702 advisory committee's note). Thus, in determining the admissibility of expert testimony, the court should approach its task "with proper deference to the [factfinder]'s role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.     Application

Plaintiffs have designated Dr. Beare as an expert provider of clinical services at substance abuse treatment centers, with extensive knowledge of the disabilities, characteristics, and circumstances of residents of sober living communities such as Harmony Haus. *See* ECF No. 37 at 1. Based on his knowledge and experience, Dr. Beare is anticipated to testify that:

(1)     Harmony Haus accepts residents in its sober living residences who often have dual diagnoses with other conditions beyond Substance Abuse Disorder, including, but not limited to severe depression, such that they present recovery complications beyond those that most sober living residences are often willing to take on;

(2)     such residents will often encounter difficulties in the recovery process that will require particularly intensive interventions to prevent relapse, such that, for periods of time often exceeding twelve hours, neither those residents nor those working with them can attend to parking issues; and

(3)     the strict enforcement of parking policies by Harmony Haus against such an individual by terminating the membership of the individual in the sober living residence because of parking violations could have potentially fatal consequences and is not a reasonable response to the circumstances.

*Id.* at 1–2.

The Court does not doubt that Dr. Beare is qualified to testify on these matters "by virtue of his 'knowledge, skill, experience, training, or education.'" *Cooks*, 589 F.3d at 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). He holds a master's degree in clinical psychology and a doctorate in industrial/organizational psychology and is a Licensed Professional Counselor Supervisor. *Id.* at 7. Dr. Beare has worked in addiction treatment in various capacities for over twenty years. *See id.* at 5–7. He has served as the director of multiple substance abuse treatment programs and facilities. *See id.* In those roles, he developed clinical programming and curriculum, trained and supervised dozens of other clinicians, and designed program policies and procedures. *See id.*

Defendant challenges Dr. Beare's qualifications to testify concerning the potentially fatal consequences of terminating Harmony Haus memberships for repeated parking violations because "he [has] no knowledge about the medical [] histories of people in the [] home to evaluate what impact ending memberships would have on such residents." ECF No. 40 at 5. "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based

12

on firsthand knowledge or observation. Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592 (internal citations omitted). Experts may base their opinions on inferences properly drawn from scientific facts. *See id.* (applying the term "knowledge" to "any body of known facts or to any body of ideas *inferred from* such facts or accepted as truths on good grounds.") (citing Webster's Third New International Dictionary 1252 (1986)) (emphasis added). Indeed, "trained experts commonly extrapolate from existing data," so long as they "explain how and why" they have extrapolated the data. *Joiner*, 522 U.S. at 144–46.

Despite his qualifications, however, it does not appear to the Court that Dr. Beare's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. That is, Dr. Beare's proposed testimony concerning the clinical reasons for Harmony Haus's failure to enforce its own, internal parking policy against its members is not relevant to any of the claims that remain to be tried in this case—Plaintiffs' claim for retaliation under § 3617 of the FHA and Defendant's counterclaims for breach of contract and for damages under Section 202.004 of the Texas Property Code.

Together, the Court's order on Defendant's motion to dismiss this action, ECF No. 19, and the final resolution of the first action, *see* First Lawsuit, ECF Nos. 29, 37, 38-1, 46, 47, significantly narrow the scope of this litigation, which centers on the enforceability of Parkstone's newly adopted fine structure—not the enforceability of the underlying parking restrictions. Plaintiffs' attempts to challenge the parking restrictions on the basis of their disability have uniformly failed. *See* ECF No. 19 at 13 (dismissing Plaintiffs' claims of intentional discrimination, disparate treatment, and failure to accommodate under 42 U.S.C. § 3604(f)(1)–(3) in connection with

Parkstone's recent enforcement efforts and noting that "Defendant decided to strictly enforce its parking restrictions—as this Court made clear Defendant could do"); *Harmony Haus*, 440 F. Supp. 3d at 669 (declining to enjoin Parkstone from enforcing the parking rules and cautioning that "[e]ach resident is expected to know all relevant deed restrictions—including the parking and noise restrictions—and strictly adhere to them."); First Lawsuit, ECF No. 37 at 17 (remanding the case for further proceedings consistent with this opinion, "including the district court's enjoining Harmony Haus from violating the declaration.").

As a practical matter, this Court has never entered an injunction directing Harmony Haus to comply with its own, internal parking policy, which contemplates terminating the memberships of residents who habitually violate the parking rules. ECF No. 42-12 at 2. Instead, pursuant to the Fifth Circuit's order in the first lawsuit, this Court merely enjoined Plaintiffs from violating the parking restrictions set forth in the Declaration. *See* First Lawsuit, ECF No. 37, 38-1, 46, 47. [2] Thus, the only question concerning Harmony Haus's conduct now before the Court is whether it complied with the deed restrictions, not with its own policies concerning membership termination.[3] Because the Court concludes that Dr. Beare's proposed testimony is not relevant to the issues that remain to be tried in this action, it is inadmissible.[4] *Daubert*, 509 U.S. at 591; FED.

---

[2]    The Court observes that, as an alternative to membership termination, Harmony Haus could adopt any number of policy solutions to address its parking problem without violating the permanent injunction issued in the first action. It could impose its own fines, for example, or assign household chores based on parking violations, or permit one of the residents to move cars as needed.

[3]    As discussed below, there is reason to doubt the accuracy of some  of the alleged parking violations that Defendant has identified since adopting the new fee structure.

[4]    Addressing Parkstone's argument that Harmony Haus is estopped from offering testimony about the consequences of membership termination, the parties dispute whether Dr. Beare's proposed testimony constitutes a new opinion or "merely an extension of his earlier trial testimony" in the First Lawsuit. ECF No. 49. Regardless of whether Dr. Beare's opinion is "new" or not, it is simply not "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

R. EVID. 401. Accordingly, Defendant's motion to exclude Dr. Beare's testimony (ECF No. 40) is granted.

## II.       Cross-Motions for Summary Judgment

### A.       Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical

evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

### B.    Application

#### 1.    *Plaintiffs' Claim for Retaliation under §3617 of the FHA*

Parkstone's motion for summary judgment as to Plaintiffs' claim for retaliation under the FHA, ECF No. 42, largely recycles the legal arguments the Court rejected in its order on Parkstone's motion to dismiss rather than addressing any evidence obtained through discovery. *Cf.* ECF No. 19 at 18–22. The Court will briefly address these arguments here in the interest of clarity and completeness but observes that they are no more persuasive at this phase of litigation in light of the summary judgment record.

Parkstone first argues that Plaintiffs' claim under 42 U.S.C. § 3617 must be dismissed because there is no stand-alone claim for retaliation under the FHA as a matter of law. ECF No.

16

42 at 15–16. As the Court noted in its order on Parkstone's motion to dismiss, however, a retaliation claim may survive even if there is no plausible discrimination claim. ECF No. 19 (citing *Wilson v. Wilder Balter Partners, Inc.*, No. 13-CV-2595, 2015 WL 685194, at \*12 (S.D.N.Y. Feb. 17, 2015); *Oxford House v. City of Baton Rouge*, 932 F. Supp. 2d 683, 701 (M.D. La. 2013) ("Because the regulations indicate that retaliation for making a complaint under the FHA is unlawful conduct in itself, . . . there is no requirement that the complainant prove underlying discrimination"). The defendant may take the same adverse action in retaliation for a plaintiff's FHA-protected activity while still not taking it *because of* the plaintiff's handicap.

It is worth noting—because it is easy to overlook—that the protections afforded under § 3617 extend beyond prohibiting retaliation for "protected activities" such as requesting an accommodation or filing a complaint or lawsuit. Section 3617 makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of" any right separately protected by the FHA. 42 U.S.C. § 3617; *see also Evans v. Tubbe*, 657 F.2d 661 (5th Cir. 1981). *Evans* is instructive. There, the plaintiff, Evans, who was Black, purchased a piece of property that was accessible only by a road that passed through land owned by Tubbe. Tubbe installed a metal gate across the road and locked the gate, preventing Evans from reaching and using her property. Evans alleged that Tubbe gave a key to the gate to all of the white people who owned property along the road, but refused to give a key to Evans. She further alleged that, on account of her race, Tubbe threatened, intimidated, and harassed her, which made her afraid to use and enjoy her property—a right protected under the FHA. The Fifth Circuit confirmed that "[u]nder the facts as alleged, the plaintiffs have stated arguably valid, federally-justiciable Fair Housing Act claims pursuant to 42 U.S.C. §§ 3604 and 3617." *Evans v.*, 657 F.2d at 663 n.3; *see also Hill v. River Run Homeowners Ass'n, Inc.*, 438 F. Supp. 3d 1155, 1183–84 (D. Idaho 2020)

("River Run construes protected activity too narrowly, arguing that conduct predating the . . . HUD complaint is irrelevant to the Hills' retaliation claim and therefore not actionable. However, the retaliation claim is based upon the Hills' desire to enjoy their home free from familial status discrimination, and there is evidence the Hills exercised their right to do so prior to the filing of their HUD complaint.").

A plaintiff's claim under § 3617 may rise and fall with a claim arising under another section of the FHA where both claims are premised on the same right or discriminatory motive. In *Evans*, for example, a finding that Tubbe's refusal to allow Evans to access her property was not racially motivated would likely have been fatal to her claim that he threatened, intimidated, and harassed her "because of" her race. *Cf. Hood v. Pope*, 627 F. App'x 295, 300 (5th Cir. 2001)) (dismissing the plaintiffs' claim under § 3604 for failing to plausibly allege that a management company's initial denial of an apartment was racially discriminatory and dismissing their § 3617 claim failing to properly allege that the harassment they endured was connected to their rights under the FHA).[5] In short, whether a claim under § 3617 can stand alone depends on both the facts surrounding the defendant's coercive, intimidating, or threatening conduct and the substance of the right the plaintiff enjoys (or seeks to enjoy) under the FHA.

Here, the Court agreed that Plaintiffs failed to plausibly allege that Parkstone's "interference" with their enjoyment of their residence—in adopting the new fine structure and enforcement mechanisms—occurred "because of" their handicap, in violation of their rights to

---

[5]     *Hood*'s holding is somewhat opaque because the factual underpinnings for the § 3617 claim asserted by the plaintiffs in that case, who were proceeding *pro se*, were not entirely clear. It is possible that *Hood* stands for the proposition that courts should dismiss § 3617 claims premised on improperly pled violations of other FHA rights. That guidance, however, would be inapplicable here given this Court's previous finding that Defendant *did* engage in discrimination under the FHA in its refusal to make a reasonable accommodation. *Harmony Haus*, 440 F. Supp. 3d at 667–69. Although the Fifth Circuit ultimately concluded that the requested accommodation was not necessary, Plaintiffs undoubtedly "stated a claim" for a plausible violation of the FHA in the First Lawsuit—the purported basis for Parkstone's retaliatory conduct. *Hood*, 627 F. App'x at 300.

enjoy their property free from discrimination under §§ 3604(f)(1) and (f)(2) of the FHA. *See* ECF No. 19 at 8–14. But these are not the only rights that the FHA secures. The FHA also prohibits retaliation in connection with a protected activity, which includes "oppos[ition] [to] any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Both requesting a reasonable accommodation and filing a lawsuit in pursuit thereof constitute protected activities. *Oxford House*, 932 F. Supp. 2d at 700 (citing *Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 340 (S.D.N.Y. 2005) (filing lawsuit is a protected activity for a retaliation claim)); *Chavez v. Aber*, 122 F. Supp. 3d 581, 599 (W.D. Tex. 2015) (requesting reasonable accommodation is a protected activity for a retaliation claim). Thus, Plaintiffs have engaged in at least two protected activities that could serve as a basis for a free-standing retaliation claim under § 3617.

Next, the Court turns to Defendant's argument that no reasonable trier of fact could conclude that its actions were taken in retaliation for Harmony Haus's protected conduct. Here, Defendant mounts a piecemeal attack on the summary judgment evidence, apparently hoping to subject Plaintiffs' retaliation claim to death by a thousand cuts. That strategy is best reserved for trial, however, as it conflicts with the Court's obligations in assessing a motion for summary judgment—to view the evidence in the light most favorable to the non-moving party and to refrain from weighing evidence and making credibility determinations. *Reeves*, 530 U.S. at 150; *Figueroa v. KK Sub II, LLC*, 289 F. Supp. 3d 426, 442 (W.D.N.Y. 2018) (analysis of causation in the pretext context is "particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts"—not just "a determination that there is no genuine dispute as to material fact."). Parkstone's compartmentalized approach to the evidence is also contrary to the

19

broad, remedial purpose of the FHA. The FHA is a "clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream," and "[g]eneralized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." *Groome Res., Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 201 (5th Cir. 2000) (quoting H.R. REP. 100–711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179). In general, the language of the FHA is "broad and inclusive" and its terms must be given a generous construction to adhere to the statute's remedial scope. *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972); *Francis v. Kings Park Manor, Inc.*, 944 F.3d 370, 376 (2d Cir. 2019).

In that vein, a claim under this section is not limited to circumstances involving "potent force or duress," but rather "extends to other actors who are in a position directly to disrupt the exercise of enjoyment of a protected right and exercise their powers with a discriminatory animus." *Texas v. Crest Asset Mgmt. Inc.*, 85 F. Supp. 2d 722, 732–33 (S.D. Tex. 2000). In analyzing § 3617, "'interference' has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under federal fair housing laws." *Walker v. City of Lakewood*, 272 F.3d 1114, 1129 (9th Cir. 2001).

Defendant asserts that "[m]uch of the conduct Harmony Haus complains about is not sufficiently adverse to constitute retaliation." ECF No. 42 at 16. But the new fine schedule and "six figures" of parking fines imposed on Harmony Haus in the span of less than a year are—to the extent that they were motivated by Plaintiffs' protected activities—clearly materially adverse to Plaintiffs' rights under the FHA. Defendant cannot plausibly argue otherwise, as the use of the word "much" appears to concede. *See* ECF No. 42 at 16. Thus, while the Court agrees that certain of the activities described in Plaintiffs' complaint and summary judgment briefing do not rise to

20

the level of material adversity required to independently establish a retaliation claim, such conduct is still relevant insofar as it bears on Parkstone's motives. This conduct includes, for example, a Parkstone board member's use of profanity in addressing Harmony Haus's owner. Such behavior likely falls into the category of "petty slights, minor annoyances, and simple lack of good manners" that are not actionable retaliatory conduct in the employment context.[6] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Kromenhoek v. Cowpet Bay W. Condo. Ass'n*, 77 F. Supp. 3d 454, 459–60 (D.V.I. 2014) ("Even reading Section 3617 broadly, in order to account for less obvious but still illegal discrimination, unfortunate skirmishes between neighbors are not made unlawful. Even discriminatory statements exchanged between neighbors do not necessarily violate Section 3617.") (citations omitted) (citing *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) and *Sheikh v. Rabin*, 565 F. App'x 512, 517–18 (7th Cir. 2014)). Nonetheless, evidence of Board members' hostility toward Harmony Haus is relevant to the extent that it sheds light on Parkstone's motives in adopting the new enforcement scheme. *See, e.g.*, *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016) (noting that a retaliation claim brought under § 3617 requires "a showing of a particular state of mind, i.e., a retaliatory motive").

Defendant likewise asserts that its installation of cameras targeted at Harmony Haus is not materially adverse because the cameras were required to collect evidence of parking violations. ECF No. 42 at 17–18 ("an occasional drive-by . . . would not be sufficient to determine if a 12-hour violation had occurred"). Parkstone also argues that its surveillance system does not target Harmony Haus specifically because the cameras "cover a broad stretch of the neighborhood that

---

[6]      "Retaliation claims brought pursuant to [§ 3617] are analyzed under the same standards that are applied to retaliation claims brought under Title VII and other employment discrimination statutes." *Chavez v. Aber*, 122 F. Supp. 3d 581, 599 (W.D. Tex. 2015) (citing *Texas v. Crest Asset Mgmt. Inc.*, 85 F. Supp. 2d 722, 733 (S.D. Tex. 2000)); *see also Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1229 (5th Cir. 1996) (noting the "strong similarities" between the language, design, and purposes of Title VII and the [FHA]").

includes ten houses." *Id.* at 17. Plaintiffs dispute this characterization of the camera placement, arguing that, to the extent the cameras capture other residences, it is only because they fall within the frames of cameras trained on Harmony Haus. *See* ECF No. 48 at 8–9; *see also* ECF No. 46-6, Chen Dep. at 49:17–50:9 (explaining that, even though parking problems elsewhere in the neighborhood were reported, the cameras were never adjusted to cover different areas). Some courts have concluded that this kind of increased surveillance does constitute an adverse action sufficient to establish a claim for retaliation. *See, e.g.*, *Cooper v. W. & S. Fin. Grp., Inc.*, 847 F. Supp. 2d 1031, 1039 (S.D. Ohio 2012) ("The specific actions [the defendant real estate developer] is alleged to have committed include photographing residents without their permission and falsely accusing the residents of engaging in criminal activity and other inappropriate behavior. These actions could be construed as intimidating, harassing and threatening to the residents"); *Walker*, 272 F.3d at 1129 (finding retaliation under § 3617 where, in part, the city "supervised [the plaintiff] more closely than it had before"). Whether the camera surveillance is an "adverse action" within the meaning of the FHA will depend on whether it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (citation and internal quotation marks omitted). Regardless of whether the cameras can support an independent basis for a claim under § 3617, however, the evidence suggesting that they have been deployed against Harmony Haus disproportionately may offer evidence of Parkstone's motives for adopting the new enforcement measures.

Defendant next asserts that Plaintiffs' protected activities—filing the First Lawsuit and requesting an accommodation—were too remote in time from the adoption of the fine structure to indicate a causal connection. ECF No. 42 at 18–20. Plaintiff filed its complaint in the First Lawsuit on October 22, 2019. *See* First Lawsuit, ECF No. 1. The Court issued its Findings of Fact and

Conclusions of Law approximately four months later, on February 18, 2020. First Lawsuit, ECF No. 29. The Parkstone Board approved the new fine structure on March 3, 2020. ECF No. 42-14. In its order on Defendant's motion to dismiss, the Court concluded that Defendant's adoption of a new enforcement scheme "[o]nly two weeks after this Court issued its judgment for Plaintiffs in the prior case" raised the possibility that the actions were taken in response to Plaintiffs' protected activities. ECF No. 19 at 20 (citing *Chavez*, 122 F. Supp. 3d at 600 (finding that two weeks between an FHA-protected activity and an adverse action was "sufficient to state that a causal connection exists between the protected activity and the adverse action")).

Defendant now argues that that "[t]he Court's judgment is not a protected activity" for the purposes of measuring temporal proximity. ECF No. 42 at 18. Defendant's argument relies on an overly rigid construction of both protected activities and temporal proximity.[7] More importantly, however, given the other evidence of Defendant's retaliatory motive described herein, the Court need not rely exclusively on temporal proximity in assessing the causal connection between Plaintiffs' protected activity and Parkstone's adverse action. Accordingly, it would be inappropriate to grant summary judgment on the basis of temporal proximity alone.

---

[7]    Plaintiffs' protected activity in filing the complaint in the First Lawsuit was clearly a but-for cause of the Court's original judgment against Defendant. The protections against retaliation for filing a complaint would appear to the Court to be somewhat illusory if they could never extend to a plaintiff's activities in prosecuting the case that she initiated in filing the complaint. *See Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 905 (E.D. Pa. 2017) ("Defendants do not cite any cases supporting their assertion that a retaliation claim cannot be based on ongoing antagonism that begins prior to the allegedly protected activity and increases after the protected activity."); *see also Hill*, 438 F. Supp. at 1183–84 ("[The defendant] construes protected activity too narrowly. . . .").

The Court does not suggest that any adverse action taken during the pendency of or shortly after the resolution of legal proceedings should constitute *prima facie* evidence of retaliation. *See Swanson v. Gen. Servs. Admin.* 110 F.3d 1180, 1188 (5th Cir.) ("[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not *always* be enough for a *prima facie* case. . . . If timing *alone* were enough, any adverse action taken against [the plaintiff] after [the filing of her EEOC complaint], no matter how justified, could be sustained as discriminatory.") (emphasis added). But again, there is no bright-line rule, nor should there be—it is a fact-specific inquiry. *See Reyes v. Fairfield Props.*, 661 F. Supp. 2d 249, 266 (E.D.N.Y. 2009) ("The adverse action need not occur immediately following the protected activity, and there is no bright line outer limit to the time; the inquiry is whether a reasonable juror could conclude that the action was taken because of the protected activity.").

In assessing whether a defendant's actions were retaliatory, a court may consider whether the temporal proximity between the request for an accommodation and the defendant's allegedly retaliatory behavior is "sufficient to state that a causal connection exists between the protected activity and the adverse action." *Chavez*, 122 F. Supp. 3d at 600 (citing *Cox v. Phase III, Invs.*, No. H-12-3500, 2013 WL 3110218, at *10 (S.D. Tex. June 14, 2013)). There is no bright-line rule in the Fifth Circuit for determining whether the time between the protected activity and the allegedly retaliatory conduct is too remote. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992) (declining to hold that the passage of fourteen months between the filing of the plaintiff's EEOC complaint and the date of termination was "legally conclusive proof against retaliation"); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that "a time lapse of up to four months has been found sufficient" evidence of a causal connection).

"Consideration of such dates is part of our analysis, but not in itself conclusive of our determinations of retaliation," especially where there is other evidence of retaliatory intent. *Shirley*, 970 F.2d at 40. *Cf. Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 306 (5th Cir. 2020) ("Because Lyons fails to provide *more than* the nine-month temporal proximity, she fails to establish a prima facie case of retaliation arising out of being switched from coaching track to coaching tennis.") (emphasis added); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004) ("Without more than timing allegations . . . summary judgment in favor of [the defendant] was proper.").

In addition to verbal hostility toward Harmony Haus exhibited by several Board members and the camera surveillance described above, Plaintiffs offer other evidence that Parkstone's motives were retaliatory. Specifically, Plaintiffs note that Defendant began issuing violation letters and assessing fines without providing any evidence or information about when and how the

parking rules were violated until June 2020 (ECF No. 48 at 7, 12), and suggest that many of the alleged violations were not, in fact, violations. ECF No. 8 at 8.[8] They also cite the new deed restriction forbidding any requested accommodation from the group-home restriction for houses within 1,000 feet of Harmony Haus as evidence that Parkstone adopted the new enforcement scheme with impermissible motives.

Parkstone insists that it adopted the new enforcement scheme for a legitimate, non-discriminatory reason: "to persuade Harmony Haus and other residents to follow the rules when the existing method had failed." ECF No. 42 at 20–21. "There was no need for more than a simple system of fines before Harmony Haus," Defendant argues, "because violations *never* continued and escalated as they have with Harmony Haus." *Id.* at 6. But Parkstone's own spreadsheet of violations shows a single parking violation by Harmony Haus in the time between its arrival in September 2019 and the adoption of the new enforcement provisions in May 2020. *See* ECF No. 42-1 at 8. The recorded violation by Harmony Haus appears to have been reported (along with parking violations at seven other addresses) on December 13, 2019, less than two months after the complaint was filed in the First Lawsuit and eleven days after Defendant filed its answer and counterclaim in that action. Additionally, while Parkstone maintains that its enforcement has been even-handed, it has also conceded—in defending its camera surveillance of Harmony Haus and nearby residences—that "an occasional drive-by . . . would not be sufficient to determine if a 12-hour violation had occurred. ECF No. 42 at 17–18. It is unclear how Defendant is monitoring

---

[8]     The summary judgment record suggests that there is ample reason to doubt the accuracy of Parkstone's records of parking violations. For example, multiple violations in one log are recorded as having occurred in the future. *See, e.g.*, ECF No. 42-2 at 62–65 (indicating nearly 100 parking violations at the Harmony Haus property in the month of December 2021, which the Court observes has not yet arrived as of the date of this order.). Even if the Court were to accept that those dozens of misdated entries constituted mere typos, the discrepancies do not end there. In many other instances, it appears that fines were recorded in the spreadsheet before the date of the alleged parking violations. *See id.* at 64 (reflecting multiple $300-fines issued on December 7, 2020, for violations that allegedly occurred on December 25, 202[0]).

residences that do not appear on the cameras, which casts some doubt on the basis for Parkstone's contention that "Harmony Haus receives more notices than anyone else, but only because it violates the rules more than anyone else." ECF No. 42 at 12.

In sum, Plaintiffs engaged in activities protected by the FHA—requesting a reasonable accommodation and filing suit thereon. Defendant enacted a new enforcement scheme with an escalating fine structure, and the temporal proximity between the protected activities and that adverse action that—taken together with other evidence of hostility toward Harmony Haus residents and evidence that Defendant's asserted reason for adopting the new fine structure was pretextual—creates a genuine fact issue as to whether that action was taken in retaliation for the protected activities. Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that a reasonable jury could find that the adverse action was taken because of Plaintiffs' FHA-protected activities. Accordingly, Parkstone's motion for summary judgment (ECF No. 42) on Plaintiffs' claim of retaliation under § 3617 is denied.

## 2.  *Parkstone's Counterclaims for Damages*

Plaintiffs move for partial summary judgment with respect to Parkstone's counterclaims for damages based on Harmony Haus's parking violations. ECF No. 43. Parkstone seeks damages for breach of contract in the form of fines "reach[ing] the six figures" imposed under the new fine structure, ECF No. 43-10 at 6, and exemplary damages in the amount of $200 per day for each day violations existed pursuant to § 202.004 of the Texas Property Code. Plaintiffs assert that because Parkstone has failed to present any evidence of actual damages, it cannot recover damages under TEX. PROP. CODE § 202.004 or in the form of the accrued fines, which, without evidence of actual damages, constitute impermissible penalties under Texas common law and the U.S. Constitution. ECF Nos. 43, 50. Parkstone responds that Plaintiffs' attacks on the fine structure are barred, or at

least limited, by the doctrines of collateral estoppel and waiver. The Court will address these alleged procedural bars before reaching the merits of Plaintiffs' motion for partial summary judgment.

Parkstone contends that Plaintiffs had an opportunity to challenge Parkstone's enforcement mechanisms during the First Trial and that their failure to do so sets a floor of $50 per violation— the threatened fine under the previous enforcement scheme—based on the principles of collateral estoppel. *See* ECF No. 45 at 4–5. The doctrine of collateral estoppel "preclude[s] relitigation of the same issue already litigated against the same party in another case involving virtually identical facts." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (1984). To determine whether collateral estoppel applies, the Court considers whether:

> (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is [any] special circumstance that would make it unfair to apply the doctrine.

*Baros v. Tex. Mexican Ry. Co.*, 400 F.3d 228, 232–33 (5th Cir. 2005) (quoting *Winters v. Shamrock Chem. Co.*, 146 F.3d 387, 391 (5th Cir. 1998)). Other safeguards include whether the facts and legal standards used to assess them are the same in both proceedings, whether a new determination is warranted by differences in the procedures employed in the two courts, and whether judicial review of the first proceeding was available. *Id.* at 233.

Parkstone's collateral estoppel argument fails for a variety of reasons, not the least of which is fairness. Given the Court's conclusion after the trial in the First Lawsuit that Parkstone had waived its claim for breach of contract, Plaintiffs can be excused for failing to raise a defense against a claim that appeared to have been abandoned. *See Harmony Haus*, 440 F. Supp. 3d at 669 n.12 ("In addressing its counterclaims, Parkstone concedes that the 'the predominant remedy' it

seeks is injunctive relief and that the 'main focus' is whether the FHA permits Plaintiffs to have twelve unrelated residents."). Moreover, Parkstone never sought damages from Harmony Haus for parking violations in the form of unpaid fines in the First Lawsuit, evidently because Parkstone had never imposed any such fines.[9] Harmony Haus had no reason or duty to attack the enforceability of a fine it had never incurred. And although Parkstone described its damages as "noise, nuisance, traffic, safety, and aesthetic concerns" in its post-trial briefing, ECF No. 25 at 10, it did not include an award based on those damages in its proposed amended judgment following the Fifth Circuit's mandate. *See* ECF No. 38-2. In short, the Court cannot agree with Parkstone that the potential $50 parking fine was "fully and vigorously litigated" or that it was "necessary to support the judgment" in the prior action. *Baros*, 400 F.3d at 232–33. Thus, the enforcement provisions in place during the First Lawsuit do not set a floor for Parkstone's damages in this case.

Parkstone also argues that Plaintiffs waived their challenge to the fines as illegal penalties by failing to raise it an affirmative defense. *See* ECF No. 45 (citing ECF No. 29). In their answer to Parkstone's counterclaim for breach of contract, Plaintiffs assert that "the fines imposed by Defendant exceed the statutory limits imposed under the applicable statutory provisions" and that "the fines imposed exceed constitutional limits." ECF No. 29 ¶ 29. Parkstone suggests that there is some disconnect between the common law nature of its breach of contract claim and the statutory nature of Plaintiffs' defense. *See* ECF No. 45 at 11 ("Parkstone's breach of contract claim is not a 'statutory' claim and the other defenses do not indicate Plaintiffs are arguing the fines are penalties and not liquidated damages on the breach of contract claim."). But such caps on damages apply to

---

[9]     Parkstone appears to concede that the only fine imposed prior to the First Lawsuit was levied against another of its community members in connection with an architectural violation that occurred in 2014. ECF No. 42-1 at 5.

*both* statutory and common law claims. *See, e.g.*, *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 157 (Tex. 2015) (construing Section 41.008 of the Texas Civil Practice and Remedies Code and noting that "[t]hough certain types of claims are excluded from the statute's application, the statutory cap applies automatically to claims not expressly excepted.").

Courts have generally held that parties need not plead statutory caps on punitive damages as affirmative defenses because, as part of a statutory scheme, they cannot be the source of unfair surprise. *See, e.g.*, *id.* ("Because the statutory cap on exemplary damages automatically applies and its scope is delineated by statute, there is little concern that plaintiffs will be genuinely surprised by its application in any given case."); *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001) ("[A] plaintiff cannot have suffered unfair surprise in the invocation of the cap, so the cap should not be waivable as a defense."). Likewise, "the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law. Enforcement of a penalty, like enforcement of an illegal contract, violates public policy." *Phillips v. Phillips*, 820 S.W.2d 785, 789–90 (Tex. 1991).

Here, the references to "statutory limits" and "constitutional limits" on punitive damages were sufficient to give Parkstone notice of Plaintiffs' position that the fines were in fact penalties. *See id.*; *see also* FED. R. CIV. P. 8(c); *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (an affirmative defense must be pled "with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced.") (internal citation omitted); *see Dyson v. Stuart Petroleum Testers, Inc.*, No. 1-15-CV-282 RP, 2015 WL 4935527, at *2 (W.D. Tex. Aug. 18, 2015) (evaluating affirmative defense under a notice-pleading standard and noting that courts in the Fifth Circuit have differing views on the question of whether affirmative defenses are subject to the heightened pleading standard enunciated in *Bell Atlantic v. Twombly*, 550 U.S. 544, (2007)

and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Moreover, the defense of penalty is apparent on the face of Defendant's counterclaim, which indicates that the fines vary "depending on the severity and type of violation." *See Uptegraph v. Sandalwood Civic Club*, 312 S.W.3d 918, 937 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (concluding that damages "unrelated to the type or extent of *injury or harm* caused by the violation" were "punitive rather than compensatory") (emphasis added) (citing *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 433 (Tex. 2005)). Thus, the Court holds that Plaintiffs did not waive their defense that the fines are an unenforceable penalty.

Even if the Court were to reach the opposition conclusion, however, Plaintiffs' waiver of the penalty argument would not immunize the fine structure from judicial scrutiny. Courts "carefully review liquidated damages provisions to ensure that they adhere to the principle of just compensation'" applicable to claims for breach of contract.[10] *Atrium Med. Ctr., LP. v. Hous. Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (citing *Stewart v. Basey*, 150 Tex. 666, 670, 245 S.W.2d 484, 486 (1952)). Although Texas favors freedom of contract, "[t]he basic principle underlying contract damages is compensation for losses sustained and no more." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 69 (Tex. 2014). Accordingly, "[l]iquidated damages must not be punitive, neither in design nor operation." *Id.* Parkstone bears the burden of proving that the fines are enforceable as liquidated damages. *Atrium Med. Ctr., LP. v. Hous. Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) ("The party seeking to enforce a liquidated-damages clause bears the burden to prove the clause is valid.").

---

[10]     "A restrictive covenant is a contractual agreement." *Ski Masters of Tex., LLC v. Heinemeyer*, 269 S.W.3d 662, 668 (Tex. App.—San Antonio 2008, no pet.)). Plaintiffs assert that they "never entered into a contract that included the escalating fine amounts Defendant seeks to collect." ECF No. 43 at 7. This argument is unavailing, however, because the Declaration—to which Plaintiffs did agree by purchasing a residence subject to the Parkstone deed restrictions—clearly empowers the Parkstone Board to enforce the deed restrictions. *See* First Lawsuit, ECF No. 3-2 at 19–20, 26.

To enforce a liquidated damages provision, "the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *See Phillips*, 820 S.W.2d at 788. "[E]ven when liquidated-damages provisions are 'properly designed' under those two criteria, they are still unenforceable when 'the actual damages incurred were much less than the liquidated damages imposed, measured at the time of the breach.'" *Hanover Ins. Co. v. Binnacle Dev., LLC*, 493 F. Supp. 3d 585, 591 (S.D. Tex. 2020) (quoting *Atrium Med. Ctr.*, 595 S.W.3d at 192–93). While the question whether a liquidated damages provision is enforceable is a question of law, "sometimes . . . factual issues must be resolved before the legal question can be decided." *See Phillips*, 820 S.W.2d at 788 (citations omitted). "For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Id.*

As to the first element, the parties do not appear to dispute that the harm caused by the parking violations is incapable or difficult of estimation. Instead, Plaintiffs challenge that Parkstone has failed to proffer any competent evidence of actual damages that could support its the claim for liquidated damages:

> During the discovery period, Defendant has consistently limited the calculation of its claimed damages to a summation of the fines it has imposed. . . . Even in its verified Responses to Plaintiffs' Interrogatories, dated November 12, 2020, and never supplemented during the remainder of the discovery period, Defendant calculates its damages exclusively in terms of fines and associated statutory damages under the Texas Property Code. It makes no reference to any specific actual damages suffered and offers no calculation of such damages.

ECF No. 43 at 4 (citations omitted). Given Parkstone's failure to offer evidence of its actual damages, Plaintiffs argue, it cannot demonstrate that any amount of liquidated damages would be

"a reasonable forecast of just compensation." *Phillips*, 820 S.W.2d at 788.

There certainly are reasons to doubt that Parkstone's fines can be enforced as liquidated damages. First, the fines appear to be untethered to "the type or extent of injury or harm" caused by the parking violations. *See Uptegraph*, 312 S.W.3d at 937. As Plaintiffs observe, the fines increase "not on the basis of any expected increase in damages, but in an attempt to add to the penalty in an effort to encourage compliance." ECF No. 50 at 7. Defendant imposes the same fine whether a vehicle is parked in the same location for mere minutes or for several hours beyond the twelve hours permitted. *See, e.g.*, ECF No. 42-2 at 42–43 (assessing the same fine of $200 for a vehicle that allegedly parked for two minutes beyond the twelve hours allowed (May 20, 2020, 9:48 pm – May 21, 2020, 9:50 am) as for a vehicle that allegedly remained for eleven hours and fifty-two minutes over the allowable time (May 26, 2020, 2:09 pm – May 27, 2020, 2:01 pm)). Likewise, it is unclear how a parking violation of less than an hour on July 28, 2020 caused *twelve times* more harm to Parkstone as a violation of over six hours that occurred on March 16, 2020. *See* ECF No. 42 at 48 (imposing a $300 fine on a black Chevy Tahoe for parking from July 27, 2020, 10:31 pm – July 28, 2020, 11:08 am); *id.* at 32 (imposing a $25 fine on a black Chevy Tahoe for parking from March 15, 2020, 2:38 pm – March 16, 2020, 8:26 am). Moreover, Parkstone's own summary judgment briefing indicates that the fine structure is punitive rather than compensatory. *See* ECF No. 42 at 11 ("[T]he Parkstone Board . . . created an escalating fine structure to discourage repeat offenders"); ECF No. 45 at 9 ("Because [parking] violations are comparatively less severe (but still should not occur), the dollar amounts of the fines are less.").

Nonetheless, the Fifth Circuit identified "some evidence at trial" in support of Parkstone's claim for breach of contract in the First Lawsuit, based on the same damages alleged in this action—"increased safety issues, higher traffic congestion on the street . . ., a diminution of value

of the neighborhood's property rights, and loss of the aesthetic and residential character of the neighborhood." *Compare* ECF No. 21 *with* First Lawsuit, ECF No. 10. Given the Fifth Circuit's ruling on the breach of contract claim in the previous action, the Court cannot conclude that Parkstone has failed to establish any damages as a matter of law. Moreover, the escalating nature of the fine structure means that the fines imposed on Plaintiffs have varied over time. Thus, the Court cannot determine whether the fines are reasonable as a whole, but must consider the fines individually. The Court's task at trial will be to assess Parkstone's actual damages in connection with the parking violations in order to determine whether the fines imposed were reasonable. *See R. Conrad Moore & Assocs. v. Lerma*, 946 S.W.2d 90, 95–96 (Tex. App.—El Paso 1997, pet. denied) (amount of plaintiff's damages should have been determined by jury before trial court could consider whether liquidated damages were reasonable forecast of just compensation); *see also La Ventana Ranch Owners' Ass'n, Inc. v. Davis*, 363 S.W.3d 632, 647 (Tex. App.—Austin 2011, pet. denied) (noting that section 202.004(a) of the Texas Property Code "creates a rebuttable presumption that a property owners' association or other representative acts reasonably in exercising its discretionary authority.").

Like Parkstone's claims for liquidated damages, its claim for statutory damages under Section 202.004(c) of the Texas Property Code will depend on its ability to establish actual damages at trial. This statute establishes a cause of action and authorizes a trial court to assess civil damages in the maximum amount of $200 for each day of the violation of a restrictive covenant. TEX. PROP. CODE § 202.004(c). Texas courts have concluded that damages assessed under section 202.004 of the Property Code are punitive rather than compensatory because they are unrelated to the type or extent of injury or harm caused by the violation. *Sanchez v. Southampton Civic Club, Inc.*, 367 S.W.3d 429, 433 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Uptegraph*,

312 S.W.3d at 937). As a result, they fall within the scope of Chapter 41 of the Texas Civil Practice and Remedies Code, which requires that a claimant prove actual damages in more than a nominal amount before exemplary damages may be collected. TEX. CIV. PRAC. & REM. CODE § 41.004(a) ("[E]xemplary damages may be awarded only if damages other than nominal damages are awarded."); *KBG Invs., LLC v. Greenspoint Prop. Owners' Ass'n*, 478 S.W.3d 111, 122–23 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("It is undisputed that Greenspoint neither alleged nor introduced evidence of actual damages. We therefore conclude that the trial court abused its discretion in awarding Greenspoint statutory damages."). Again, given that the Fifth Circuit held that Parkstone had established a claim for breach of contract in the First Lawsuit based on the very same evidence of damages at issue in this action, the Court cannot conclude that Parkstone has failed to establish evidence of damages as a matter or law.

Accordingly, Plaintiffs' motion for summary judgment as to Parkstone's claims for liquidated damages for breach of contract and statutory damages under section 202.004 of the Property Code are denied.

## CONCLUSION

For the forgoing reasons, Defendant's motion to exclude Dr. Beare's testimony (ECF No. 40) is **GRANTED**; Defendant's motion for partial summary judgment (ECF No. 42) is **DENIED**; and Plaintiffs' motion for partial summary judgment (ECF No. 43) is **DENIED**.

The Court further **ORDERS** the parties to mediate this case before United States Magistrate Judge Henry J. Bemporad.

Mediation is a mandatory but non-binding settlement conference wherein the parties attempt to resolve their differences with the assistance of a third-party facilitator. All proceedings in a mediation session are confidential and protected from discovery. No subpoenas, summons,

citations, or other process shall be served at or near the location of any mediation session, upon any person entering, leaving, or attending any mediation session.

Counsel and parties shall proceed in a good faith effort to try to resolve this case and shall confer with Judge Bemporad and agree upon a mediation date. If no agreed date can be found, Judge Bemporad will select a date and the parties shall appear as directed. Unless this Court extends the deadline, mediation shall occur no later than **February 23, 2022**.

Following the mediation, the Court will be advised only that the case did or did not settle. No other information will be transmitted to the Court by the mediator or any other party.

The Fifth Circuit has concluded that Harmony Haus need only have six unrelated residents living at the residence. 851 F. App'x at 467. Further, the Fifth Circuit held that Parkstone's parking and noise restrictions can be enforced. *Id.* The parties are at this point needlessly spending time and money litigating issues that have already been resolved. This dispute must come to an end.

It is so **ORDERED**.

SIGNED this 23rd day of November, 2021.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE